Clinton CHAMBERS, et al.

v.

EXXON CORPORATION, et al.

No. Civ.A. 96–7611–A.

United States District Court,
M.D. Louisiana.

Jan. 21, 2000.

Linda S. Harang, Stephen B. Murray, Gano D. Lemoine, III, Murray Law Firm, New Orleans, LA, for plaintiffs.

William Henry Bennett, III, Exxon Company, USA, New Orleans, LA, Patricia E. Weeks, Frilot, Partridge, Kohnke & Clements, LC, New Orleans, LA, for defendant.

LaVon D. Raymond, Lou Ann Owen, Louisiana Department of Health & Hospitals Legal Services, Baton Rouge, LA, for intervenor.

## RULING ON MOTION

JOHN V. PARKER, Chief Judge.

Before the court is a motion in limine filed on behalf of the defendant, Exxon Corporation (Exxon). Plaintiffs have filed an opposition. Jurisdiction is based upon 28 U.S.C. § 1332.

Exxon has filed a motion in limine to exclude the opinion testimony of plaintiffs' experts. In its motion, Exxon contends that the proposed testimony of plaintiffs' experts is not admissible because this evidence does not meet the necessary foundation requirements set forth by the Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Both parties have fully briefed the issue and oral argument was heard on January 14, 2000.[1]

---

1. Exxon's motion in limine seeks to exclude the expert testimony of plaintiffs' causation experts, Drs. Dicke, Brautbar and Infante, and plaintiffs' "exposure" experts, Frank Parker and Vernon Rose. For the purposes of this ruling, the court will only address the admissibility of the opinions of plaintiffs' "causation" experts.

## Facts

Plaintiff, Clinton Chambers, worked as an independent contractor in Exxon's Baton Rouge, Louisiana refinery from about January 1991 until January 1996. Plaintiff alleges that, while working in Exxon's refinery, he was exposed to chemicals and substances that contained benzene over the five year period of his employment. In 1996, Mr. Chambers was diagnosed with chronic myelogenous leukemia (CML). He claims that his alleged benzene exposure at the Exxon facility caused his disease.

## Applicable Law & Discussion

Pursuant to Rule 104 of the Federal Rules of Evidence, a district court shall determine preliminary questions regarding the admissibility of evidence. Rule 702 specifically governs the admission of expert testimony, and provides that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." Federal Rule of Evidence 702.

■ In *Daubert*, the Supreme Court made clear that the critical concerns of Rule 702 are the reliability and relevancy of the scientific evidence. Before a district court may admit scientific testimony, it must first determine "whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." *Daubert*, 509 U.S. at 592, 113 S.Ct. at 2796. The district court's determination "entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue," i.e., reliability and relevancy. *Id.*

■ Under the reliability prong of this analysis, a court should assess whether the reasoning or methodology underlying the expert's theory or technique utilizes valid scientific methods and procedures, without deciding upon the correctness of the expert's conclusions. The Court offered several non-exclusive factors to guide federal courts in evaluating whether the particular scientific testimony is reliable. Such factors include: (1) whether the expert's theory or technique has been or can be tested; (2) whether the theory or technique on which the expert's opinion is based has been subjected to peer review and publication; (3) whether the particular scientific technique has a known or potential rate of error, and whether standards exist to control the technique's operation; and (4) whether the technique is generally accepted in the scientific community. *Daubert*, 509 U.S. at 593–94, 113 S.Ct. at 2796–97. These factors are neither exhaustive nor applicable in every case, but serve as "indicia of the reliability" of the theory or technique underlying the expert's testimony.

■ Secondly, the court must determine whether the expert opinion is relevant, in that it sufficiently relates to the facts in issue so that it will assist the trier of fact in resolving the factual disputes. *Daubert*, 509 U.S. at 591, 113 S.Ct. at 2795–96. In this regard, Rule 702 requires a valid scientific connection to the relevant inquiry as a precondition to admissibility. *Id.* at 2796.

■ In performing its "gate keeping" function, this court must first identify the basis of the expert's opinion to ascertain whether the methods and procedures which the witness used to reach his conclusions are scientifically reliable. The court's focus "must be solely on principles and methodology not on the conclusions [they] generate." *Daubert*, 509 U.S. at 595, 113 S.Ct. at 2797.

■ The disease from which Mr. Chambers suffers, chronic myelogenous leukemia, develops in the general population.

It develops in those that have been exposed to benzene and those that have not. Without a controlled study, there is no way to determine if CML is more common in people who are exposed to benzene than those who are not. Therefore, in a case such as this, the most conclusive type of evidence of causation is epidemiological evidence. *Brock v. Merrell Dow Pharmaceuticals, Inc.*, 874 F.2d 307, 311 (5th Cir. 1989), modified by 874 F.2d 307, 311 (5th Cir.1989). Epidemiological studies are necessary to determine the cause and effect relationship between an agent, in this case exposure to benzene, and a disease, CML. Epidemiological studies can be defined as the branch of medicine that deals with the causes, distribution, and control of disease in humans.[2]

Plaintiffs produced three expert witnesses who opine that exposure to benzene causes CML. In forming their opinions, plaintiffs' experts reviewed several published articles suggesting a relationship between benzene exposure and certain types of leukemia. Plaintiffs' experts did produce research that has found that exposure to benzene causes acute myelogenous leukemia (AML). However, plaintiffs' experts were unable to provide any research study that concludes that exposure to benzene causes CML. Several studies mention the possibility, but each one concludes that there was no statistically significant association between CML and exposure to benzene. In other words, plaintiffs' experts have not offered an epidemiological study that conclusively establishes a statistically significant risk of contracting CML from exposure to benzene. In fact, in their opposition, plaintiffs concede the absence of statistically significant epidemiological data.[3]

At oral argument, counsel for plaintiffs suggested that there are epidemiological studies which show a statistically significant excess of CML. On closer reading, the court finds that this is simply not the case. For example, counsel for plaintiffs refers to the "Pliofilm Study."[4] However, this article is an update of an earlier cohort study that reported an excess number of "leukemias." Regarding the specific type of leukemia involved in this case, CML, only two cases were reported. Out of those two cases, one CML was reported in an individual who was exposed to less than background levels of benzene for less than one month. The **authors** of that study did not find a statistically significant excess of CML.

In addition, plaintiffs refer to Yin, *et al.*, *Leukemia in Benzene Workers: A Retrospective Cohort Study*, British Journal of Industrial Medicine, 44:24–28 (1987). This article is one of several studies of exposure to benzene by workers in factories across China. Again, this study did not report a statistically significant excess of CML associated with benzene exposure. In fact, in Yin, *et al.*, *An Expanded Cohort Study of Cancer Among Benzene Exposed Workers in China*, Environ. Health Perspect. 104:1339–41, a study based on the 1987 study, Yin concludes that "[r]isk was also increased for chronic myelogenous leukemia and acute lymphocytic leukemia, but not statistically significant."

In emphasizing the importance of a positive epidemiological study in a toxic tort case, the court in *Brock*, 874 F.2d at 311,

---

2. *American Heritage College Dictionary*, 3rd ed., Houghton Mifflin Company, 1993.

3. In their opposition memorandum, plaintiffs write:
    Defendants repeatedly argue that there is an absence of *statistically significant* epidemiological data demonstrating benzene/CML causation. Infante explains that his is so because leukemias generally are relatively rare forms of cancer, and that

therefore subdividing them into different types of leukemia hinders the ability to analyze cause and effect on statistics alone. He therefore emphasizes the need to look at other factors.
Opposition at p. 8.

4. Mary B. Paxton, *et al.*, *Leukemia Risk Associated with Benzene Exposure in a Pliofilm Cohort: I. Mortality Update and Exposure Distribution*, 14 Risk Analysis 147 (1994).

wrote that "the most useful and conclusive type of evidence in a case such as this is epidemiological studies." In *Brock*, plaintiff's experts could not offer any epidemiological study that found a statistically significant risk between exposure to Bendectin and birth defects. The Fifth Circuit held: "We find, in this case, the Brocks' failure to present statistically significant epidemiological proof that Bendectin causes limb reduction defects to be fatal to their case." 874 F.2d at 307.

Also, the court in *In re Breast Litigation*, 11 F.Supp.2d 1217, 1228 (D.Colo. 1998), wrote:

> The reports submitted by Plaintiff's experts fail to present a single peer-reviewed, controlled epidemiological study that support their causation theories. This is not to say that epidemiological studies are required in this type of tort action. Epidemiological studies are not the magical cure.... [However], [t]he court's inquiry is whether reliable scientific evidence, based on sound methodology, has been presented. What is significant in this case is that the substantial body of epidemiological evidence demonstrates that [exposure to benzene] [does] not double the risk of [CML].

In an attempt to support their causation theories, plaintiffs' experts analyze the epidemiological studies by beginning with "the assumption that the population studied exhibits benzene induced chronic myelogenous leukemia."[5] This "assumption" is not sound scientific methodology. The proper interpretation of epidemiological studies was explained in *Wade–Greaux v. Whitehall Laboratories, Inc.*, 874 F.Supp. 1441 (D.Virgin Islands 1994). The court wrote:

> Epidemiologists use an analytical tool known as the "null hypothesis," which postulates that there is no association between a specific exposure and a particular outcome.... The goal of an epidemiological study is to determine

whether one can reject the null hypothesis and conclude that in fact there is an association between the exposure and the outcome. *Id.* at 1451 (citations omitted).

That court further noted that:

> A positive epidemiological study is one that presents a statistically significant association between a particular exposure and an increased risk of experiencing a particular outcome. *Id.* at 1452 (citations omitted).

This court accepts these statements as an accurate description of the pertinent scientific methodology.

It must be noted that there is no lack of epidemiological studies. On the contrary, experts offered by Exxon have produced a number of scientifically performed studies which demonstrate no association between exposure to benzene and development of CML. The experts on behalf of plaintiffs ignore these studies or seek to substitute their personal opinions for the conclusions of the studies. The court is not here weighing the conclusions of the experts, it is merely pointing out that in the face of scientifically accepted studies, the expert witness must offer more than his personal opinion. Essentially, that is what plaintiffs present to the court here.

The court concludes that the causation theories of plaintiffs' experts are not based on valid scientific reasoning. The reports submitted by plaintiffs' experts fail to present a single peer-reviewed, controlled epidemiological study that supports their causation theories. Therefore, their personal opinions, albeit expert, do not suffice as evidence because, as the Fifth Circuit stated in *Brock*, theories of toxic causation "unconfirmed by epidemiological proof cannot form the basis for causation in a court of law." 874 F.2d at 315.

Because the court will exclude the testimony of plaintiffs' causation experts, there is no need to examine the scientific relia-

---

**5.** Plaintiffs' Memorandum in Opposition at p. 3.

bility of the methodology utilized by the exposure experts. Their evidence fails to meet the relevancy test. Since plaintiffs have no admissible evidence tending to prove that exposure to benzene does cause CML in humans, the degree of plaintiff's exposure to benzene is not relevant.

Their testimony will also be excluded.

Accordingly, the motion in limine submitted on behalf of Exxon (Doc. 60), regarding Drs. Brautbar, Dicke, and Infante, and Frank Parker and Vernon Rose is hereby GRANTED and the testimony of those witnesses will be excluded at trial.